UNITED STATES BANKRUPTCY COURT
DISTRICT OF DELAWARE

------------------------------------------------------------ x
*In re*                                                      :    **Chapter 11**
                                                             :
**TRANSFORMATION TECH**                                      :    Case No. 20–12970 (\_\_\_)
**INVESTORS, INC.,**                                         :
                                                             :
        **Debtor.**[1]                                       :
------------------------------------------------------------ x

# DECLARATION OF MARK PAPE IN SUPPORT OF
# CHAPTER 11 PETITION AND FIRST DAY PLEADINGS

I, Mark Pape, hereby declare under penalty of perjury:

1.   I am the independent director of Transformation Tech Investors, Inc. ("**TTI**" or the "**Debtor**"), a Delaware corporation, as debtor and debtor in possession in the above-captioned chapter 11 case (the "**Chapter 11 Case**"). I am authorized to submit this declaration (the "**First Day Declaration**") on behalf of the Debtor.

2.   I am a managing director of Brookview Advisors, Inc. I have served on the Debtor's board of directors (the "**Board**") since May 2017. In addition to my role at TTI, I serve on the board of directors of Hallmark Financial Services and Wilhelmina International. In the past, I have also held board positions at Affirmative Insurance, Specialty Underwriters Alliance, Y-Wire Technologies, and JW Exploration. I began my career at KPMG and throughout my career have had senior positions, either as chief financial officer or chief executive officer, at a number of companies. Most recently, I was the Chief Financial Officer at Oryon Technologies LLC, a developer of next-generation electroluminescent lighting technology. I hold a master's

---

[1] The Debtor was formerly known as Interface Preferred Holdings, Inc. The last four digits of the Debtor's federal tax identification number are (6677) and the Debtor's corporate headquarters and service address is 3773 Corporate Center Dr., Earth City, MO 63045.

degree in Business Administration from Harvard Business School and a bachelor's degree in Government from Harvard University. I am also a licensed Certified Public Accountant.

3. I am generally familiar with the Debtor's financial matters, cash flows, and underlying books and records. All facts set forth in this First Day Declaration are based upon my personal knowledge of the Debtor's equity and capital structure and related financial information gathered from my review of its books and records, relevant documents, and information supplied to me by members of the Debtor's management team and advisors. If called to testify, I could and would testify competently to the facts set forth in this First Day Declaration.

4. On the date hereof (the "**Petition Date**"), the Debtor filed a voluntary petition commencing the Chapter 11 Case. The Debtor has no operations and is a holding company owning 100% of the membership interests (the "**ISS Shares**") of Interface Security Systems, L.L.C. ("**ISS**", and together with the Debtor and its non-debtor affiliates collectively, the "**Company**"), a Louisiana limited liability company. ISS is the operating entity of the Company. As detailed herein, prior to the Petition Date, the Company explored a number of options to create a path to provide funding to help ISS foster growth and support its business operations. Unfortunately, as discussed further below, due to restrictions imposed in connection with the issuance of debt at an upstream entity, it became apparent that an out of court solution was not achievable. As a result, through this Chapter 11 Case, the Debtor will seek to consummate a stock sale (the "**Sale**") of the ISS Shares to Innovation Tech Investors, Inc. (the "**Stalking Horse Bidder**"), the designee of Prudential Capital Partners V, L.P., Prudential Capital Partners Management Fund V, L.P., and Prudential Capital Partners (Parallel Fund) V, L.P. (collectively,

"**Prudential**")[2] and SunTx Capital Partners, L.P. (together with certain of its affiliates, "**SunTx**"), or another higher or otherwise better bidder pursuant to section 363 of the Bankruptcy Code. The proposed sale process will enable the Debtor to secure the funding of necessary liquidity to ISS while avoiding the cost and potential operational disruption that may result from an ISS restructuring process. In addition, ISS will continue to service all of its customers and honor its obligations to its debtholders and trade vendors as it has done in the ordinary course of business. Moreover, the Stalking Horse Bidder has committed to (x) invest significant capital in ISS, provided that it is the successful bidder, that is necessary to fund operations and take advantage of certain go-forward growth opportunities and (y) assume the Debtor's guarantee obligations under the ISS Credit Agreement and the ISS SPA (the "**Assumed Guaranty**").

5.  I submit this First Day Declaration on behalf of the Debtor in support of the Debtor's (a) voluntary petition for relief that was filed under chapter 11 of the Bankruptcy Code and (b) "first day" motions, which are being filed concurrently herewith (collectively, the "**First Day Motions**"). The Debtor seeks the relief set forth in the First Day Motions to minimize the adverse effects caused by the commencement of this Chapter 11 Case, fund restructuring related costs and make certain transfers necessary to support operations at ISS pending consummation of the Sale. I have reviewed the Debtor's petition and the First Day Motions, or have otherwise had their contents explained to me, and it is my belief that the relief sought therein is essential to ensure the Sale of the ISS Shares.

---

[2] Solely for the purposes of this First Day Declaration, the term Prudential may also include unaffiliated investors in these entities that have agreed to be bound to the RSA (as defined herein) or for whom such entities have been authorized to act on their behalf.

**GENERAL BACKGROUND**

A. **The Debtor's Equity Ownership**

6. The Debtor is part of a group of privately-owned companies indirectly and substantially owned by SunTx. The Debtor is the direct parent company of ISS. The Debtor's common stock is fully held by Interface Special Holdings, Inc. ("**ISH**"), a Delaware corporation. In addition to the common stock, the Debtor issued series A preferred stock (the "**Preferred A Stock**") pursuant to that certain Securities Purchase Agreement, dated as of August 2, 2017 (as amended, the "**ISS SPA**"), between the Debtor, ISH, ISS, each guarantor and the purchasers identified therein. Prudential holds approximately 60% of the Preferred A Stock.

7. Other than its ownership of ISS, the Debtor has no other business or assets. In addition, the Debtor has no employees and only one bank account. An organizational chart of the Debtor and its affiliates is attached hereto as **Exhibit A**.

B. **ISS**

8. As set forth above, the Debtor is the sole equity owner of ISS. Founded in 2001, ISS is a leading nationwide provider of monitored physical security and managed private network services to primarily large, commercial multi-site national account customers. ISS is recognized as the leader and pioneer in providing proprietary, compressive bundle or monitored, mission-critical managed network, physical security, interactive video monitoring and business intelligence services over a private payment card industry compliant cloud-based network to many of North America's most recognized companies. ISS's customers include retail, hospitality, dining, jewelry, and quick service restaurant industries. ISS is headquartered in St. Louis, Missouri, with other locations in California, Arkansas, Louisiana, Tennessee, and Texas.

9. ISS operates in an extremely competitive market. ISS continues to identify and

implement new technologies and opportunities to better serve its customers and to attract new customers. As discussed further below, in early 2020, the Company began to explore paths to raise additional capital to support operations and fund growth initiatives at ISS.

### C. The Company's Capital Structure

10. In the years prior to the Petition Date, as ISS faced declines in liquidity, the Company completed a number of restructurings and capital raises to address ISS's needs. As of the Petition Date, the Company has approximately $546.1 million of aggregate funded indebtedness, comprised of approximately: (i) $278.8 million outstanding under the ISS Credit Agreement (as defined herein); (ii) $131.6 million outstanding under the ISH PIK Notes (as defined herein); and (iii) $135.7 million outstanding under the ISS Subordinated Notes (as defined herein).

11. ISS is currently in default under the terms of the ISS Credit Agreement. As described further below, the Debtor is the guarantor of ISS's obligations under the ISS Credit Agreement (the "**ISS Guaranteed Obligations**"). The ISS Guaranteed Obligations are secured by substantially all of the Debtor's assets, including the ISS Shares. In addition, the Debtor is a guarantor of ISS's obligations under the ISS Subordinated Notes.

12. A detailed discussion of the Debtor's and its non-debtor affiliates' capital structure, including various debt obligations, is set forth below.

#### i. ISS Credit Agreement

13. In 2019, ISS refinanced its existing credit facilities and entered into that certain Credit Agreement, dated as of August 7, 2019, by and among ISS, the Debtor, U.S. Bank National Association, as the administrative agent (the "**ISS Administrative Agent**"), Capital One, National Association, as revolver agent (the "**ISS Revolver Agent**"), and the lenders party

thereto (the "**ISS Secured Lenders**" and, together with the ISS Administrative Agent and the ISS Revolver Agent, the "**ISS Lender Parties**"), as amended by the First Amendment and Waiver to Credit Agreement, dated as of October 4, 2019, the Second Amendment to Credit Agreement, dated as of December 9, 2019, and the Omnibus Amendment to the Loan Documents and Forbearance Agreement, dated as of April 14, 2020 (as further modified, amended or supplemented from time to time, the "**ISS Credit Agreement**"). The ISS Credit Agreement provides three separate credit facilities: (a) a term loan facility maturing in 2023 (the "**First Lien Term Loan**"), (b) a revolving credit facility maturing in 2023 (the "**Revolving Credit Facility**"), and (c) a last-out term loan maturing in 2023 (the "**Last-Out Term Loan**"). As of the Petition Date, the aggregate outstanding principal amount of (a) the First Lien Term Loan was $251.5 million (b) the Revolving Credit Facility was $16.3 million, and (c) the Last-Out Term Loan was $11 million.

14. In connection with the ISS Credit Agreement, the Debtor provided a guaranty of the Guaranteed ISS Obligations and pledged all of its membership interests in ISS (and proceeds thereof) to the ISS Administrative Agent for the benefit of the ISS Lender Parties.

    *ii.*    ***ISH PIK Notes***

15. In August 2017, ISH, the Debtor's parent, issued up to $66,077,331 in the aggregate principal amount of 19% PIK Senior Notes due 2023 (the "**ISH PIK Notes**") pursuant to that certain Indenture, dated as of August 2, 2017 (as modified, amended, or supplemented from time to time, the "**ISH PIK Notes Indenture**"), by and among ISH, as issuer, and Wilmington Trust, National Association, as trustee. As of the Petition Date, the aggregate outstanding principal of the ISH PIK Notes due 2020 was approximately $131.6 million.

16. The Debtor is not a party to the ISH PIK Notes Indenture or a guarantor of ISH's obligations under the ISH PIK Notes, however, the ISH PIK Notes Indenture contains a number of restrictive covenants, including restrictions on the Debtor's and ISS's ability to sell their assets, raise much needed capital and refinance their existing debt. As discussed further below, these restrictive covenants have stymied the Company's efforts to restructure outside of chapter 11.

### iii. ISS Subordinated Notes

17. Also in connection with the 2017 restructuring, ISS issued $100,000,000 in the aggregate principal amount of 14% Senior Subordinated Promissory notes due July 31, 2023 (the "**ISS Subordinated Notes**") to Prudential and certain other entities (together with Prudential collectively, the "**ISS Subordinated Noteholders**") pursuant to the ISS SPA. As of the Petition Date, the aggregate outstanding principal amount of the ISS Subordinated Notes due 2023 was approximately $135.7 million.

18. In connection with the ISS SPA, the Debtor provided a guaranty of all the obligations of ISS under the ISS SPA with respect to the ISS Subordinated Notes.

### D. Events Leading to Chapter 11 Case

### i. Negotiations with the ISH PIK Noteholders

19. Understanding the additional liquidity necessary to support ISS's business and its growth initiatives, in May 2020, the Company began evaluating potential strategic and restructuring alternatives. The Company and its advisors began discussions with their various stakeholders regarding the capital needed at ISS. In the course of these discussions, Prudential and SunTx expressed a willingness to provide additional funding to ISS, however, the ability to access such funding would require the consent of the holders of the ISH PIK Notes (the "**ISH**

7

**PIK Noteholders**") pursuant to the terms of ISH PIK Notes Indenture. The Company, Prudential and SunTx had multiple discussions with the ISH PIK Noteholders in an effort to come to a consensual out-of-court resolution. Unfortunately, the parties could not reach agreement on the terms to allow Prudential and SunTx to provide additional funding to ISS.

### ii.     *The Company Conducted a Prepetition Marketing Process*

20.     After negotiations with the ISH PIK Noteholders failed, the Company and its advisors evaluated a number of alternative paths forward. In September 2020, the Company retained Imperial Capital, LLC ("**Imperial**") to provide investment banking services in connection with a potential sale. The Company and Imperial engaged in marketing efforts focusing on, and to determine interest in, the acquisition of the operating business.

21.     As part of its marketing efforts, on September 14, 2020, Imperial circulated an initial teaser to sixty-eight (68) prospective strategic purchasers. On September 21 and October 1, 2020, Imperial sent follow-up emails to those parties that had not responded to the teaser. In addition, Imperial conducted targeted outreach to those parties that they determined were the most likely strategic purchasers. The Debtor received executed non-disclosure agreements from four (4) parties, who were provided with a confidential information memorandum. Imperial was also able to provide prospective purchasers with information responsive to due diligence requests and participated in preliminary due diligence calls.

22.     Unfortunately, the prepetition sale process did not produce any offers to acquire the operating business. As a result, it became apparent that a bankruptcy filing of the Debtor would be necessary given (i) the lack of any interest to purchase the operating business; (ii) the failure of the parties to reach an agreement regarding a consensual recapitalization; and (iii) the

ongoing funding needs of ISS. Accordingly, the Debtor began to focus its efforts entirely on an in-court restructuring.

> ### iii. The Company Determined a Sale of the ISS Shares was the Only Viable Path Forward to Access Additional Funding and Appointed a Special Committee at TTI to Negotiate a Sale

23. Ultimately, the Debtor determined that the sale of the ISS Shares through a Court-approved marketing and sale process (the "**Sale Process**") was in the best interest of the Debtor's estate because it would (i) allow ISS to continue to operate its business without any negative impact of a chapter 11 filing; (ii) allow ISS to obtain the additional necessary funding; (iii) allow ISS to continue to honor its obligations, including to customers and the ISS Lender Parties, in the ordinary course of business; and (iv) reduce administrative costs, including professional fees.

24. Recognizing that the most likely purchasers of the ISS Shares would be Prudential and SunTx, each which has at least one representative on the Board, the Board appropriately determined the need for independence, and in September 2020, the Board created a special committee (the "**Special Committee**") to, among other things, independently evaluate all proposals for the purchase of the ISS Shares, and consider, evaluate, and negotiate any agreements related to such transaction. As the only independent director on the Board, I am the sole member of the Special Committee.

### THE RSA, THE PROPOSED SALE AND THE DIP FINANCING

> #### i. RSA

25. At the same time as the Debtor was pursuing the sale transaction, the Debtor was also negotiating with its current stakeholders to pave the way for the potential sale and the necessary financing needed for the chapter 11 filing. As discussed above, the Debtor is the guarantor of ISS's obligations under the ISS Credit Agreement. As a result, the Debtor

9

recognized that in order to successfully pursue a sale in chapter 11, the Debtor would need support from the ISS Lender Parties.

26. To that end, on November 11, 2020, the Debtor entered into a restructuring support agreement (the "**RSA**") with (i) the ISS Lender Parties holding all of the outstanding amounts the first-lien term and revolving loans under the ISS Credit Agreement (the "**Consenting ISS Lender Parties**"), (ii) certain holders of the ISS Subordinated Notes holding approximately 60% of the outstanding amount thereof, (iii) the Stalking Horse Bidder, and (iv) ISS. A copy of the RSA is attached hereto as **Exhibit B**. Pursuant to the RSA, the Consenting ISS Lender Parties, among other things, agreed to support the Sale Process.

27. In addition, pursuant to the RSA, the Consenting ISS Lender Parties have consented to allow the loans granted pursuant to the DIP Facility (as defined below) to be obtained on a senior secured priming basis, in exchange for the agreement that the Stalking Horse Bidder, if determined to be the successful bidder, will assume the Assumed Guaranty, and will provide working capital to ISS to fund its operations and growth initiatives. Specifically, pursuant to the RSA, the Stalking Horse Bidder, if the successful bidder, agreed: (i) to contribute $30 million in cash to ISS (the "**Equity Investment**"); (ii) that the Equity Investment shall be used pay down (a) $14 million of the outstanding amount due under the First Lien Term Loan (but not the Last-Out Term Loan) and (b) $16 million of the outstanding amount due under the Revolving Credit Facility, of which the Debtor is a guarantor; (iii) that Prudential and SunTx will enter into a guaranty (the "**Sponsor Guaranty**") committing to contribute $20 million[3] in cash to ISS for working capital; and (iv) that the Last-Out Term Loan shall be converted into equity in the Stalking Horse Purchaser (the "**Last-Out Term Loan Equity Conversion**" together with the

---

[3] Any capital contribution made to ISS under the DIP Facility will be credited against the $20 million promised under the Sponsor Guaranty.

Equity Investment and the Sponsor Guaranty, the "**Additional Stalking Horse Consideration**"). Further, the Sale Process has been designed in accordance with the milestones for this Chapter 11 Case as contemplated by the RSA and the proposed financing facility with the Stalking Horse Bidder (collectively, the "**Case Milestones**").

### ii. Stalking Horse Agreement; Bidding Procedures Motion

28. While the prepetition marketing process did not produce any offers to acquire the operating business, Prudential and SunTx expressed an interest in pursuing a transaction whereby they would, among other things, acquire the ISS Shares, reduce the level of secured debt at ISS and thereafter provide ISS with the additional capital necessary to support operations and pursue growth opportunities.

29. After extensive negotiations between the parties, on November 11, 2020, the Debtor entered into the Purchase and Sale Agreement (the "**Stalking Horse Agreement**"), whereby the Stalking Horse Bidder agreed to acquire the ISS Shares, subject to Court approval and the receipt of any higher or better offers. The Stalking Horse Agreement serves as the backbone for a series of transactions what will result in approximately $55 million in value comprised of cash, capital contributions, and debt satisfaction being conferred upon the Debtor and ISS. The Stalking Horse Bidder will acquire the ISS Shares for $5 million (the "**Purchase Price**") through a combination of (a) a credit bid of the DIP Facility (as defined below) that has been funded and (b) cash, plus the assumption of the Assumed Guaranty. As set forth above, in addition to the Purchase Price and the Assumed Guaranty, the Stalking Horse Bidder has also committed to provide the Additional Stalking Horse Consideration (together with the Purchase Price and the Assumed Guaranty, the "**Stalking Horse Consideration**"). The Stalking Horse

Agreement does not provide for any break-up fee or expense reimbursement. As noted above, affiliates of SunTx and Prudential will serve as the Stalking Horse Bidder.

30. Given the nature of the Sale, the Debtor and its professional advisors are confident that interested parties will be able to analyze and consider the sale opportunity in a time frame that allows the Debtor to complete a value-maximizing sale transaction in the first approximately 60 days of this Chapter 11 Case.

31. In furtherance of Imperial's efforts to market the ISS Shares, and in accordance with the Case Milestones, the Debtor will be filing a motion (the "**Bidding Procedures Motion**") seeking authority to proceed with a bidding and auction process to consummate the Sale that the Debtor expects will generate maximum value for the ISS Shares. To facilitate the Sale, the Debtor, in consultation with Imperial and its other professionals, will propose certain customary bidding procedures to preserve flexibility in the Sale Process, generate the greatest level of interest in the ISS Shares, and result in the highest or otherwise best value (including the Additional Stalking Horse Consideration) for the ISS Shares.

32. Given the Debtor's prepetition marketing efforts and consistent with the Case Milestones, the Bidding Procedures Motion requests the following timeline:

| **On or before December 1, 2020** | Hearing to consider approval of the Bidding Procedures and entry of the Bidding Procedures Order |
|---|---|
| **December 16, 2020 at 4:00 p.m. (prevailing Eastern Time)** | Sale Objection Deadline |
| **December 16, 2020 at 5:00 p.m. (prevailing Eastern Time)** | Bid Deadline |
| **December 18, 2020 at 5:00 p.m. (prevailing Eastern Time)** | Deadline for Debtor to notify Potential Bidders of their status as Qualified Bidders |
| **December 21, 2020 at 10:00 a.m. (prevailing Eastern Time)** | Auction to be held virtually (if necessary) |
| **December 22, 2020** | Target date for the Debtor to file with the Court the Notice of Auction Results |
| **December 23, 2020 at 4:00 p.m. (prevailing Eastern Time)** | Supplemental Objection Deadline |

12

| **On or before December 1, 2020** | Hearing to consider approval of the Bidding Procedures and entry of the Bidding Procedures Order |
| **December 28, 2020** | Proposed date of the Sale Hearing to consider approval of Sale and entry of Sale Order |
| **On or after December 30, 2020** | Closing Date (unless or to the extent Successful Bidder agrees to waive the 14-day stay of Sale Order) |

33. The bidding procedures, including the proposed timeline, are designed to maximize the value received for the ISS Shares and to facilitate a fair and open process in which all interested bidders may participate. The Debtor believes that the proposed timeline is sufficient to complete a fair and open sale process that will maximize the value received for the ISS Shares in light of the Debtor's prepetition marketing efforts. Indeed, the most likely competing bidders are among those already contacted by Imperial. If new bidders emerge, the proposed timeline will provide them with sufficient time to perform due diligence and bidders can utilize the Stalking Horse Agreement as a template upon which to base their bids. Accordingly, the Debtor believes that the schedule is sufficient and fairly balances providing potentially interested purchasers with enough time to consider the sale opportunity with the need to consummate the Sale quickly in order to maximize value.

34. Further, the Debtor will continue to market and solicit offers for the ISS Shares to a wide range of potential purchasers and will work diligently with all parties that have expressed an interest to date. In this way, the Debtor intends to maximize (i) the number of participants in the sale process and (ii) the value of the ISS Shares.

35. As set forth above, the Debtor has determined that value will be maximized by commencing the Chapter 11 Case and continuing an orderly sale process. The Debtor believes that the commencement of this Chapter 11 Case and the implementation of a Court supervised sale process allows other bidders to make competing bids and maximize the value of the ISS Shares for the benefit of the Debtor's stakeholders.

36. A sale pursuant to section 363 of the Bankruptcy Code is the most appropriate course of action for the Debtor. As set forth above, if the proposed Sale is consummated, the Stalking Horse Bidder will acquire the ISS Shares and provide the Stalking Horse Consideration for the benefit of all stakeholders. ISS will continue to honor its obligations to its debtholders and trade creditors in the ordinary course throughout the Chapter 11 Case. The proposed sale process will allow ISS to maintain its day-to-day operations with its customers with no disruptions. As set forth above, the Debtor does not believe that the Sale could be consummated outside of chapter 11 due to the restrictive covenants contained in the ISH PIK Notes Indenture.

### iii. DIP Facility

37. As noted above, the Debtor is a non-operating company with limited available cash. In order to prosecute this Chapter 11 Case, consistent with the proposed Sale Process, and to maximize the value of the Debtor's interests in ISS, the Debtor needs post-petition financing. Because the Debtor is a holding company and not burdened with operating expenses, it is anticipated that the Debtor's primary expenses will be the cost and expenses associated with the Chapter 11 Case. The Debtor does not have the typical immediate needs relating to employee obligations or other operating expenses.

38. As discussions continued with the Stalking Horse Bidder, it was clear that the Debtor, as a non-operating company, would require access to DIP financing to cover the anticipated costs and expenses associated with the chapter 11 filing and the Chapter 11 Case. The Special Committee, in consultation with its advisors, realized that the Debtor's prospects for securing third-party DIP financing, however, were severely hampered by the existence of the $278.8 million in Guaranteed ISS Obligations. As set forth above, the Guaranteed ISS Obligations are secured by substantially all of the Debtor's assets, including the ISS Shares.

Accordingly, the Debtor had no unencumbered assets to offer a third party lender as collateral and any DIP financing would need to be junior to the Guaranteed ISS Obligations (absent consent from the ISS Lender Parties). The Stalking Horse Bidder was uniquely positioned to provide the necessary DIP financing, as the structure of their bid and contemplated investment in ISS provided the ISS Lender Parties with the motivation for allowing themselves to be primed by an appropriately sized DIP facility. As a result, the Special Committee, in consultation with its advisors, concluded that there were no other financing alternatives and began negotiations with the Stalking Horse Bidder with respect to DIP financing.

39. After a series of arm's length negotiations between the Debtor and the Stalking Horse Bidder, the Debtor accepted the proposal from entities affiliated with the Stalking Horse Bidder to provide a $5 million DIP credit facility (the "**DIP Facility**") pursuant to that certain $5,000,000 First Lien Senior Secured Note Facility Term Loan Agreement (as amended, restated, or otherwise modified from time to time in accordance with the terms thereof, the "**DIP Credit Agreement**"). The proposed DIP Facility provides the Debtor with the liquidity necessary to fund the Chapter 11 Case, as well as make the intercompany transfers necessary to fund ISS. Further, the proposed DIP Facility offers below-market terms for a loan of this size and nature. But perhaps most importantly, the DIP Facility has the support of the ISS Lender Parties, as reflected by their agreement to allow the DIP Facility to prime their secured interests in the ISS Shares (as evidenced by the RSA). Accordingly, the Special Committee, in consultation with its advisors, determined that the DIP Facility provides the best post-petition financing option available to the Debtor under the circumstances, and a marketing process for third-party financing would be futile.

15

40. As set forth above, the DIP Facility is available for chapter 11 related expenses, including professional fees and the intercompany funding necessary to support operations at ISS and foster ISS's business and growth initiates. The Debtor's obligations under the DIP Credit Agreement are secured by liens on substantially all of the Debtor's assets pursuant to sections 364(c)(2), 364(c)(3) and 364(d) of the Bankruptcy Code (subject only to certain prior liens and the Carve-Out (as such term is defined therein)). As described above, pursuant to the RSA, the ISS Loan Parties have consented to the DIP Facility priming their existing liens. The DIP Credit Agreement also provides ISS Lender Parties with adequate protection in the form of (i) adequate protection liens on all of the DIP Collateral (as defined therein) and all proceeds recovered from avoidance actions; (ii) an adequate protection superiority claim; and (iii) adequate protection fees. The DIP Credit Agreement also provides the DIP Lender with a super-priority administrative claim under section 364(c)(1) of the Bankruptcy Code. Pursuant to the terms of the Stalking Horse Agreement, the outstanding DIP Obligations (as defined therein) shall be credit bid against the purchase price at closing pursuant to section 363(k) of the Bankruptcy Code.

41. The DIP Facility also contemplates, in accordance with the approved budget, that a portion of the DIP Facility will be used to fund ISS during the course of the Chapter 11 Case (the "**Capital Contributions**"). Although, ISS is generally able to fund operations and pay its obligations through revenue collected from its business, the Debtor and the DIP Lenders wanted to ensure the value of the Debtor's interest in ISS during the Chapter 11 Case. The Capital Contributions will help avoid any potential disruption to ISS or its business, which is the Debtor's only material asset as the sole member of ISS. As a result, I believe that the Capital

16

Contributions are appropriate and will benefit the Debtor and its estate during the Chapter 11 Case.

42. In my business judgement, access to the DIP Facility will provide the Debtor with the necessary liquidity to administer this Chapter 11 Case and conduct the contemplated Sale Process. Without access to the DIP Facility, the Debtor's ability to successfully prosecute the Chapter 11 Case will be jeopardized, to the detriment of all of the Debtor's stakeholders.

## OTHER FIRST DAY MOTIONS

43. In addition to the Bidding Procedures Motion and the motion to approve the DIP Facility, the Debtor is also seeking approval of (i) a motion for an order authorizing the Debtor to continue using its existing bank account, consistent with its pre-petition practices, and the Debtor's existing business forms; and (ii) an application for an order approving the retention of Reliable Companies d/b/a Reliable as (a) claims and noticing agent pursuant to section 156(c) of the Judicial Code and Local Rule 2002-1 and (b) administrative agent.

44. I have reviewed each of the First Day Motions, proposed orders, and exhibits thereto, and the facts set forth therein are true and correct to the best of my knowledge, information, and belief. Moreover, I believe that the relief sought in each of the First Day Motions is vital to enabling the Debtor to make the transition to chapter 11 and to therefore preserve and maximize the value of the Debtor's estate for the benefit of the Debtor's stakeholders.

## CONCLUSION

45. The Debtor's ultimate goals in this Chapter 11 Case are to maximize the value of its estates for the benefit of its stakeholders and to support ISS's business. A sale of the ISS Shares under section 363 of the Bankruptcy Code is the best way to accomplish this. In the near

term, however, to minimize any loss of value, the Debtor's immediate objective is to promote stability during the early stages of this Chapter 11 Case. I believe that if the Court grants the First Day Motions, the prospect for achieving this objective will be enhanced.

46. I hereby certify that the foregoing statements are true and correct to the best of my knowledge, information and belief and respectfully request that all of the relief requested in the First Day Motions be granted, together with such other and further relief as is just and proper.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this 11th day of November 2020.

                                  Transformation Tech Investors, Inc.
                                  Debtor and Debtor in Possession


                                  */s/ Mark Pape*
                                  Mark Pape

                                  *Independent Director of Transformation Tech Investors, Inc.*

RLF1 24302661v.1